# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

BRIAN STRIBLING,

        Plaintiff,

     v.                            **Case No. 22-CV-495**

UNITED PARCEL SERVICE, INC.,

        Defendant.

---

# DECISION AND ORDER

---

Plaintiff Brian Stribling brings this action against his employer, United Parcel Service, Inc. ("UPS"), alleging violations of Title VII of the Civil Rights Act. UPS has moved for summary judgment. (ECF No. 22). The motion is fully briefed and ready for resolution. All parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 9, 10.)

## 1. Facts

Stribling has worked as a feeder driver for UPS since 1998. (ECF No. 33, ¶ 2.) He is African American. (*Id.*, ¶ 2.) Because UPS is a unionized company, Stribling is a member of the International Brotherhood of Teamsters ("the union"). (*Id.*, ¶ 3.)

## March 2016 Confrontation with Henry Dismukes

This action stems from a March 2016 confrontation between Stribling and one of his supervisors, Henry Dismukes, that turned into an ongoing problem in the workplace. In March 2016, Dismukes, who is African American, terminated another feeder driver, Randy Filz, who is Caucasian, for insubordination. (ECF No. 33, ¶¶ 12-13.) When Stribling reached out to Filz to discuss why he had been fired, Filz told Stribling that he had refused to comply with an order from Dismukes that he believed would have violated protocol. (*Id.*, ¶ 14.) The next time Stribling was at work, he relayed Filz's version of events while talking with some of his coworkers, including driver Charles Watson. (*Id.*, ¶¶ 14-15.)

Shortly thereafter, Stribling was loading his vehicle and preparing for his daily route when he observed Dismukes talking to Watson. (ECF No. 33, ¶ 15.) Dismukes then walked over to Stribling and accused him of talking about him negatively with the other drivers, telling Stribling that "you got to stick together, blacks got to stick together no matter what." (*Id.*, ¶ 16; ECF No. 32, ¶ 7.) Dismukes accused Stribling of "not being black enough" and called him a "sellout." (*Id.*) Dismukes warned Stribling, "I'm going to start watching you." (*Id.*)

Stribling told a union steward about his interaction with Dismukes. (ECF No. 33, ¶ 17.) The union steward told Stribling he would pass the information on to Filz, who had a grievance hearing the next day. (*Id.*) The union steward also encouraged Stribling

to lodge a complaint with the UPS Helpline, an independently monitored number that employees can call to report workplace concerns. (*Id.*, ¶¶ 9, 17.)

A few days later, on March 9, 2016, Stribling called the UPS Helpline and filed a complaint against Dismukes. (ECF Nos. 33, ¶ 18; 25-12.) In his complaint Stribling reported that Dismukes accused him of not speaking to Dismukes after Filz was fired, that Dismukes asked Stribling why he was not talking to him, and that it had been an unprofessional interaction. (*Id.*) The complaint did not mention any race-related comments allegedly made by Dismukes. (*Id.*)

Human Resources ("HR") representatives Andy DeLeon and Jenny Bucholz reached out to Stribling in response to the Helpline complaint to notify him that they were investigating the incident and to ask what he was hoping for in terms of an outcome. (ECF No. 33, ¶ 19.) Stribling said he wanted to have a meeting with Dismukes, a union steward, and Filz. (*Id.*) DeLeon and Bucholz instructed Stribling not to contact Dismukes while his complaint was being investigated. (*Id.*)

DeLeon and Bucholz reached out to Dismukes's supervisor, feeder manager Larry Watts, who is also African American. (ECF No. 33, ¶ 20.) They informed him of Stribling's concerns as well as his request to set up a meeting. Watts went to Stribling and asked him why he "went to the white people," in reference to DeLeon and Bucholz, and told him that going to them for help was the behavior of "sellout negroes." (*Id.*) Watts agreed to have a meeting with Stribling, Dismukes, and a union steward but not

Filz. (*Id.*) Although Stribling disputes that Watts agreed to include a union steward in the meeting (ECF No. 33, ¶ 20), in his deposition Stribling testified that Watts tried to hold a meeting with Stribling, Dismukes, and union steward Kyle Ventela, but Stribling refused to attend any such meeting. (*See* ECF No. 34-8 at 16.)

Stribling filed a second complaint through the UPS Helpline on April 15, 2016, in which he again detailed his March interaction with Dismukes and reported that no meeting had occurred to resolve the dispute. (ECF Nos. 33, ¶ 21; 25-13.) The Helpline complaint again did not mention any race-related comments. (*Id.*)

Bucholz reached out to Watts about Stribling's second complaint. (ECF No. 33, ¶ 22.) Watts again agreed to have a meeting with Stribling, Dismukes, and a union steward but not Filz. (*Id.*) Stribling again disputes that Watts agreed to include a union steward in the meeting (ECF No. 33, ¶ 20), but his testimony reflects that Watts tried to hold a meeting with Stribling, Dismukes, and union steward Kyle Ventela, but Stribling refused to attend. (*See* ECF No. 34-8 at 16.) As a result, no meeting occurred. (ECF No. 33, ¶ 22.)

Months later, on July 24, 2016, Stribling filed a third complaint with the UPS Helpline. (ECF Nos. 33, ¶ 23; 25-14 at 6.) He complained that he was supposed to meet with Bucholz, Watts, Dismukes, union stewards Brian Farber and John Lepak, and a labor manager on July 20 but had not received a response regarding the meeting. (ECF No. 25-14 at 6.) Stribling expressed that he felt like management was trying to sweep the

matter under the rug and asked for an investigation. (*Id.*) Once again, the complaint did not mention any race-related comments allegedly made by Dismukes. (*Id.*)

According to Stribling, after the March 2016 confrontation with Dismukes coworkers made disparaging comments about his race to him. (ECF No. 38, ¶ 14.) Stribling maintains that sometime in 2016 Charles Watson, another driver who is also African American, called him a "sellout" and "an Uncle Tom" and told him he was white. (*Id.* (citing ECF No. 38-4 at 32).) Additionally, coworker Calvin Martin, also African American, told Stribling in 2016 he should not be "doing this to black management" in reference to the dispute with Dismukes.[1] (*Id.* (citing ECF No. 38-4 at 32-33).)

### Stribling's Ongoing Issues at UPS

Stribling maintains he filed an EEOC charge at some point in 2016. (ECF No. 38, ¶ 27.) UPS disputes that Stribling ever filed an EEOC charge in 2016 and maintains that the only charge Stribling filed in 2016 was an NLRB charge unrelated to race. (*Id.* (citing ECF No. 25-16).)

In August 2016 Watts fired Stribling for gross insubordination for refusing to work a scheduled shift that Stribling told him would interfere with a doctor's

---

[1] UPS objects to the statements of Stribling's coworkers on hearsay grounds. (ECF No. 38, ¶ 27.) The court overrules UPS's objection. The rule against hearsay renders inadmissible out-of-court statements offered to prove the truth of the matter asserted. Fed. R. Evid. 801, 802. The statements by these coworkers are not being offered to prove the truth of the matter asserted, but for their effect on Stribling with respect to his perception of a hostile work environment at UPS.

appointment. (ECF No. 33, ¶ 24.) After a hearing with Watts, Stribling, and the union, the parties agreed to reinstate Stribling with backpay. (*Id.*) Stribling maintains that, after Watts tried to fire him, Watts told him, "you took this downtown." (ECF No. 38, ¶ 27.)

A few days after the grievance hearing, UPS moved Watts to another department. (ECF No. 33, ¶ 25.) As a result, he was no longer Stribling's manager. (*Id.*) After Watts was moved, Stribling had no further issues with him. (*Id.*)

Although Stribling's issues with Watts ceased, he continued to have problems with Dismukes. Stribling asserts that Dismukes continued to make racial remarks to him on a weekly basis, regularly referring to him as a "sellout negro" and an "Uncle Tom." (ECF No. 33, ¶ 26.)

In November 2018 Stribling went to get a winter weather hat but noticed that Dismukes (whom he had been directed to avoid) was working in the room where the hats were kept. (ECF No. 33, ¶¶ 27-28.) When Stribling asked a supervisor to go get a hat for him, the supervisor told him it would be fine for him to get one. (*Id.*) When Stribling went to get a hat, Dismukes accused him of stealing. (*Id.*, ¶ 29.) Stribling responded that they were not supposed to be speaking and left. (*Id.*) Dismukes followed Stribling into the dispatch office and asked who had authorized him to rummage through the drawers. (*Id.*, ¶ 30). When a union steward who was present asked Dismukes what was going on, Dismukes said that he thought Stribling was stealing. (*Id.*) Stribling said he wanted to go home for the day, but the union steward encouraged

him to stay, and Dismukes told Stribling to go back to work. (*Id.*, ¶ 31.) Stribling returned to work. (*Id.*) During this interaction, Dismukes did not mention race or make any racial remarks to Stribling. (*Id.*, ¶ 32.)

After the incident, UPS directed Stribling and Dismukes to avoid one another. (ECF No. 33, ¶ 32.) Stribling also received permission from his manager, Tracy Richter, to take restroom breaks at a nearby Kwik Trip so he could avoid running into Dismukes. (*Id.*, ¶ 33.)

Stribling maintains that Dismukes's racial comments continued until Dismukes retired, sometime in 2022 or 2023.[2] (ECF Nos. 33, ¶ 32; 38, ¶ 15.) UPS disputes this, pointing out that Stribling testified at his deposition that the last time Dismukes made any racial comments to him was after a grievance hearing following the 2018 hat incident. (ECF Nos. 33, ¶ 32; 38, ¶ 50 (citing ECF No. 34-8 at 26-27).) UPS also points out that Stribling never mentioned these comments in the Helpline complaints he filed, nor did he file any separate complaints reporting the comments Dismukes was allegedly making. (ECF No. 33, ¶ 26.)

Stribling does not dispute that he did not include these allegations in his Helpline complaints or in union grievances but asserts that he verbally complained to various UPS personnel about Dismukes's comments. He maintains that he complained to manager Brian Zelinski (who replaced Watts as feeder manager) "at least once a week

---

[2] The facts do not clarify when Dismukes retired.

about racial discrimination, harassment, and retaliation from 2016 to 2023." (ECF Nos. 33, ¶ 26; 38, ¶ 32 (citing ECF No. 34-8 at 44).) Stribling also states that he reported instances of harassment to manager Richter every week. (ECF No. 38, ¶ 33 (citing ECF No. 34-8 at 45).)

Stribling also contends that he reached out to Mike Marshall, the Northern District Plains Manager, by email regarding Dismukes's racial comments and that Marshall promised to "take care of this." (ECF No. 38, ¶ 30.) However, the emails Stribling sent to Marshall did not mention racial discrimination. (*See* ECF No. 34-2.)

On December 14, 2021, Stribling went to the Kwik Trip and saw that Dismukes was there, too. (ECF No. 33, ¶ 34.) When Dismukes asked Stribling if he had anything to say to him, Stribling ignored him. (*Id.*) They did not interact any further and both left the store. (*Id.*) Stribling filed a grievance with the Union regarding this interaction, complaining that Dismukes was intimidating him and approaching him in a threatening manner. (*Id.*, ¶ 34-35.) But Stribling did not mention concerns of racial discrimination in his grievance. (*Id.*)

**Other Issues Regarding Stribling's Employment at UPS**

Stribling asserts that a number of other incidents are relevant.

In July 2020 Richter denied Stribling's request for a day off. (ECF No. 38, ¶ 54.) Stribling was ultimately able to take the day off, however. (*Id.*)

8

Sometime in 2022 Stribling encountered his former coworker, Charles Watson, who by then was retired, at the Kwik Trip where Stribling took breaks. (ECF No. 38, ¶ 64.) Stribling asserts that Watson tried to elbow him in the face. (*Id.*)

In May 2022 UPS "tried to discipline" Stribling for taking time off, but Stribling filed a union grievance and the discipline was dismissed. (ECF No. 38, ¶ 68.)

Stribling also states that he has received verbal warnings for calling in to tell UPS he would not be at work, and in January 2023 he received a written warning regarding his attendance. (ECF No. 38, ¶¶ 55, 69.)

Stribling also alleges that he went to a local restaurant and was served food by a woman who claimed to be Dismukes's daughter that made him ill. (ECF No. 38, ¶ 63.) Stribling considers this "retaliation [by Dismukes] because that was her father." (*Id.*) Stribling does not clarify when this occurred.

In December of 2020 Stribling filed a charge of discrimination with the Wisconsin Equal Rights Division. (ECF Nos. 33, ¶ 36, n. 7; 25-18.) Stribling received his right to sue letter on January 31, 2022. (ECF Nos. 38, ¶ 72; 34-1.) Stribling filed this action on April 22, 2022. (ECF No. 1.)

## 2. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the

outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016).

### 3. Analysis

Stribling's complaint asserts two claims against UPS. The first is a claim of race discrimination under Title VII, and the second is for retaliation under Title VII in which Stribling claims that UPS intentionally retaliated against him for exercising his rights under Title VII by subjecting him to a hostile work environment. (ECF No. 1 at 10.) In his response to UPS's motion for summary judgment, however, Stribling claims that UPS "has misconstrued this case as a typical race discrimination claim" under which Stribling would be required to utilize the burden-shifting framework established under *McDonnell-Douglass v. Green*. (ECF No. 31 at 2 (citing 411 U.S. 792 (1973)).) Instead, Stribling claims that he "has produced evidence of a racially hostile work environment

Case 2:22-cv-00495-WED   Filed 05/03/24   Page 10 of 28   Document 39

at UPS, a completely separate and distinct legal analysis not governed by *McDonnell-Douglas*." (*Id.*)

Stribling does not clearly articulate the nature of his hostile work environment claim. Throughout his brief he points to instances where he believes he was retaliated against and states that he was subject to a hostile work environment based on both race and retaliation. (ECF No. 31 at 30.) Therefore, for purposes of summary judgment, the court will construe Stribling's claim as alleging that he was subjected to a hostile work environment because of his race and in retaliation for engaging in protected Title VII activity. To the extent the complaint alleges a claim of race discrimination under Title VII, it will be dismissed.

### 3.1. Timeliness

UPS argues that Stribling's claim is time-barred because the allegations related to his claim occurred more than 300-days before he filed his charge with the Wisconsin Equal Rights Division. (ECF No. 23 at 3.)

In Wisconsin, before bringing a lawsuit in federal court under Title VII, a plaintiff must file a charge of discrimination with either the Equal Employment Opportunity Commission ("EEOC") or the Wisconsin Equal Rights Division within 300 days following the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e); *Paul v. Horicon Works*, No. 19-CV-746-PP, 2020 WL 1875769, at *5 (E.D. Wis. Apr. 15, 2020). Under the continuing violation doctrine, however, a court may consider otherwise time-

barred conduct for purposes of a hostile work environment claim so long as "an act contributing to the claim occurs within the filing period." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). "A court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.* at 120.

Stribling filed his charge with the Wisconsin Equal Rights Division on December 3, 2020. (ECF No. 25-18 at 2.) Therefore, his hostile work environment claim is timely if he can identify harassment that occurred on or after February 7, 2020 (300 days before he filed his WERD charge).

UPS contends that many of the actions contributing to Stribling's claim occurred before February 7, 2020. (ECF No. 23 at 3.) For example, the confrontation between Dismukes and Stribling regarding Filz's termination occurred in March 2016. Stribling's interactions with Watts occurred in 2016. The comments Stribling alleges to have received from his coworkers occurred in 2016 following his confrontation with Dismukes.

Stribling acknowledges that many of the actions contributing to the alleged hostile work environment occurred before February 7, 2020, but he contends the harassment continued into 2022 or 2023. (ECF No. 31 at 28.) Stribling argues that the conduct occurring prior to and during the statutory period "involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same

manager, such that they all constitute one unlawful employment practice for purposes of Title VII." (ECF No. 31 at 30 (citing *Morgan*, 536 U.S. at 126).)

In reply, UPS argues that the continuing violation doctrine does not apply to save Stribling's claim because the incidents Stribling points to within the statutory period did not have a discriminatory motive. (ECF No. 37 at 2-3.)

Indeed, many of the actions that Stribling points to appear unrelated to his race. Additionally, as discussed below, there is no evidence that these incidents were fueled by any retaliatory motive. But Stribling does maintain that until Dismukes retired he continued to make racially charged comments to him. (*See* ECF No. 31 at 28-29 (citing ECF No. 34-8 at 37-38).)

In his deposition Stribling gave seemingly conflicting testimony as to when Dismukes last made racial comments to him. At one point he testified that the last comment occurred after the hat incident, in December 2018. (ECF Nos. 33, ¶ 32; 38, ¶ 50 (citing ECF No. 34-8 at 26-27).) But he then testified that Dismukes continued to make racial comments to him all the way up until Dismukes retired in 2023. (ECF No. 34-8 at 44.) This testimony creates a genuine issue of fact as to when the conduct contributing to the hostile work environment ended. As such, the court cannot say as a matter of law that the pre-period conduct Stribling points to as contributing to the hostile work environment cannot be considered when evaluating Stribling's claim.

### 3.2.     Hostile Work Environment

Title VII prohibits employers from discriminating against employees based on membership in a protected class. *See* 42 U.S.C. § 2000e-2. A work environment is hostile for purposes of Title VII "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment.'" *Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1115 (7th Cir. 2022) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To prove a hostile work environment claim, a plaintiff must show: "(1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Id.* at 1115-16 (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)). To prove a retaliatory hostile work environment, the inquiry is the same, except the plaintiff must show that the harassment was in retaliation for protected activity, rather than based on membership in a protected class. *Flanagan v. Off. Of Chief Judge of Cir. Ct. of Cook Cnty., Illinois*, 893 F.3d 372, 375 (7th Cir. 2018).

### 3.2.1.   Retaliatory Conduct Contributing to a Hostile Work Environment

According to Stribling, he has been subjected to retaliation "for complaining about race discrimination internally and to the EEOC, for many years during his

employment." (ECF No. 31 at 1.) However, he rarely identifies specific retaliatory conduct pertaining to a protected activity.

To the extent Stribling argues that his written complaints to the UPS Helpline or his union grievances constitute protected activity under Title VII, and that any harassing conduct arising out of the filing of those complaints contributes to a retaliatory hostile work environment, he is incorrect. "'Protected activity' is 'some step in opposition to a form of discrimination that the statute prohibits.'" *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011)). Stribling's written complaints do not raise concerns regarding race discrimination or retaliation. (*See* ECF Nos. 25-4, 25-5, 25-6, 25-7, 25-12, 25-13, 25-14.) As a result, they do not qualify as protected activity for purposes of Title VII.

Stribling also maintains that he filed an EEOC charge in 2016 and that he was subject to retaliation as a result, although the court notes that he did not produce this charge in his materials opposing UPS's motion for summary judgment. Stribling points to two instances in which he believes he was subjected to retaliation for filing such a charge. First, he argues that Watts tried to fire him in retaliation for filing the EEOC charge. (ECF No. 31 at 19.) Stribling believes this was retaliatory because "as soon as" Watts found out about the charge he "took action against" Stribling by firing him (Stribling was eventually reinstated with back pay). (*Id.*; ECF No. 33, ¶ 24.)

Suspicious timing may support an inference of retaliation "[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005). Stribling does not state at what point in 2016 he filed the EEOC charge. Consequently, it is unclear whether Watts' actions followed soon after. Moreover, the only evidence Stribling offers to show that Watts knew of such a charge is that Watts told him, "you took this downtown." (*Id.* (citing ECF No. 34-8 at 20).) Stribling assumes that Watts was referring to the EEOC charge, but admits that he was never expressly told that Watts was aware of the charge. (*See* ECF No. 34-8 at 20.) There is no evidence allowing the court to infer any retaliatory motive with respect to Watts's attempt to fire Stribling.

Stribling also points to the incident in which he went to a restaurant where he was allegedly served food that made him sick by a server claiming to be Dismukes's daughter. (ECF No. 31 at 12.) Stribling states that he "considered the incidents 'retaliation [by Dismukes] because that was her father.'" (*Id.* (quoting ECF No. 34-8 at 31).) Setting aside the hearsay problem posed by the server's statement that she was Dismukes's daughter, Stribling does not clarify how this incident reflects any retaliatory motive. Again, he offers no evidence that Dismukes knew about his alleged EEOC charge. In fact, Stribling admits he never discussed it with Dismukes. (*See* ECF No. 34-8 at 30.)

Stribling fails to draw any other connections between any protected activity and instances of harassment he allegedly experienced. It is well-established that perfunctory and undeveloped arguments are forfeited. *See, e.g., Barker v. Quick Test, Inc.*, 2016 U.S. Dist. LEXIS 32755 (N.D. Ill. Mar. 15, 2016) (citing *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010)).

Consequently, Stribling has not pointed to competent evidence demonstrating that any conduct contributing to the alleged hostile work environment at UPS was retaliatory. Therefore, UPS's motion for summary judgment is granted as to Stribling's claim that he was subject to a hostile work environment in retaliation for complaining about race discrimination at UPS.

### 3.2.2. Race-Related Conduct Contributing to a Hostile Work Environment

#### 3.2.2.1. Causation

UPS argues that Stribling cannot establish that he was subjected to a hostile work environment because of his race. UPS acknowledges that harassment Stribling allegedly experienced included references to his race but argues that the harassment was not "based on" race.[3] (ECF No. 23 at 10.) UPS contends that Stribling's claim is a "race-plus" claim (i.e., a claim that the harassment was based on both his race plus a non-protected

---

[3] UPS's argument as to causation only refers to Stribling's allegations regarding the March 2016 incidents in which Dismukes and Watts made racially charged comments toward Stribling, not Stribling's allegations that Dismukes's comments continued for years.

Case 2:22-cv-00495-WED   Filed 05/03/24   Page 17 of 28   Document 39

characteristic). (*Id.*); *see Kimble v. Wis. Dep't of Workforce Dev.*, 690 F. Supp. 2d 765, 769 (E.D. Wis. 2010). "Stribling seeks to prove Dismukes harassed him because Stribling is an African American who did not support Dismukes's employment decision." (*Id.*) As a result, UPS argues that Stribling's claim is not viable without showing that "a similarly situated employee outside of the protected class was treated more favorably." (*Id.* (citing *Kimble*, 690 F. Supp. 2d at 771).)

UPS points out that, while the Seventh Circuit has not decided whether race-plus claims present a cognizable theory of discrimination, other courts have required that the plaintiff show similarly situated employees who were not members of the protected class received more favorable treatment. (ECF No. 23 at 10, n. 2 (citing *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009); *Leggett v. JW Aluminum Co.*, 2:09-0246-PMD-BM, 2009 WL 2885306, at *3 (D.S.C. Sept. 1, 2009)).)

The authority that UPS cites does not support the assertion that, for a Title VII hostile work environment claim, the exclusive means of proving causation for a plaintiff claiming harassment based on a protected characteristic and a non-protected characteristic is showing that similarly situated employees who are not members of the same protected class were treated more favorably. *Kimble* involved a Title VII race and gender disparate treatment discrimination claim, not a hostile work environment claim. The court stated the well-established rule that the plaintiff needed to show that a similarly situated employee was treated more favorably to demonstrate a causal

18

connection between the disparate treatment and the plaintiff's protected characteristics. 690 F. Supp. 2d at 769; *see also Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781 (7th Cir. 2007) ("To make a prima facie case of disparate treatment, Boumehdi must demonstrate that 1) she was a member of a protected class; 2) she was meeting her employer's legitimate business expectations; 3) she suffered an adverse employment action; and 4) *her employer treated similarly situated employees outside of the class more favorably*.") (emphasis added). And in *Coffman*, which involved both a sex-plus discrimination claim as well as a hostile work environment claim, the Seventh Circuit explained that, with respect to causation,

> [w]hether or not we explicitly recognize "sex plus height" as a vehicle for a Title VII discrimination suit, Coffman must demonstrate that the driving evaluations, the fitness for duty evaluations, and the subsequent suspensions from duty and reassignment to light duty occurred *at least in part* because she is female.

578 F.3d at 564 (emphasis added). Stribling does not need to show that similarly situated non-African American employees were treated more favorably to establish a causal connection between his race and the harassment he experienced.

Stribling maintains that Dismukes, Watts, and coworkers made racially charged comments to him after his 2016 confrontation with Dismukes. (ECF No. 38, ¶ 14.) He further maintains that Dismukes continued to call him a "sellout negro" and an "Uncle Tom" on a weekly basis from March 2016 until Dismukes's retirement in 2022 or 2023.

(ECF No. 33, ¶ 26.) In short, issues of fact exist as to whether Stribling was harassed because of his race.

### 3.2.2.2. Subjectively and Objectively Hostile Environment/Severity of Harassment

A hostile work environment is one that is "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000). To prove a hostile work environment claim, "the alleged harassment must be 'both subjectively and objectively so severe or pervasive as to alter the conditions of [his] employment and create an abusive working environment.'" *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (citation omitted). In determining whether conduct is sufficiently severe or pervasive to constitute a hostile work environment, the court looks to the totality of the circumstances, including: (1) the frequency of the conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim. *Scaife*, 49 F.4th at 1116.

UPS does not dispute that Stribling subjectively perceived the work environment at UPS to be hostile. Instead, it argues that Stribling's claim fails the objective prong

because the harassment he experienced was subjected to was not so severe or pervasive as to alter the terms and conditions of his employment. (ECF No. 23 at 11.)

Many of the comments Stribling was subjected to (being referred to as a "sellout negro," an "Uncle Tom," being told he is not "black enough," etc.) are clearly racially derogatory remarks that a reasonable person could find offensive. "While there is no 'magic number' of slurs that indicate a hostile work environment, we have recognized before that an unambiguously racial epithet falls on the 'more severe' end of the spectrum." *Cerros v. Steel Techs.*, Inc., 398 F.3d 944, 950 (7th Cir. 2005). These comments were also made directly to Stribling, which weigh heavier than secondhand remarks when assessing whether a hostile work environment exists. *Scaife,* 49 F.4th at 1116 (7th Cir. 2022) (citing *Gates v. Bd. of Educ. of the City of Chicago,* 916 F.3d 631, 638–39 (7th Cir. 2019); *Dandy v. United Parcel Serv., Inc.,* 388 F.3d 263, 271 (7th Cir. 2004)).

As to the frequency of the comments, UPS only focuses on the comments made to Stribling in 2016 and does not address Stribling's allegations that Dismukes continued to call him names until he retired . UPS advances that these isolated comments from 2016 are too remote to constitute a hostile work environment, pointing out that "several isolated offensive remarks that occur over numerous years is insufficient to create a racially hostile work environment." (ECF No. 23 at 11 (citing *Poullard v. McDonald,* 829 F.3d 844, 858 (7th Cir. 2016); *Pierce v. Ill. Dep't of Human Servs.,* 355 F. App'x 28, 32 (7th Cir. 2009); *Ezell v. Potter,* 400 F.3d 1041, 1048 (7th Cir. 2005)).)

If the facts were limited only to a few isolated instances, then UPS's argument that the harassment was not sufficiently severe or pervasive might fare better. The cases UPS relies on for support involve situations where employees experienced isolated remarks over varying periods of time. *See Poullard*, 829 F.3d at 858-59 (three "arguably race-tinged remarks" over fourteen months did not rise to requisite level of severe and pervasive conduct); *Pierce*, 355 F. App'x at 31-32 (seven race-related incidents over ten years did not rise to the level of an objectively hostile work environment).

But Stribling alleges frequent verbal harassment over an extended, years-long period. He testified that after the March 2016 incident Dismukes, Watts, and coworkers made racially charged comments to him, and that Dismukes continued to make these comments to him on a weekly basis for a period of seven to eight years until Dismukes retired. (ECF No. 34-8 at 37-38.) The Seventh Circuit has found that similar situations can give rise to a hostile work environment in violation of Title VII. *See Passananti v. Cook Cnty.*, 689 F.3d 655, 669 (7th Cir. 2012) (holding that the evidence was sufficient for a jury to find conduct sufficiently severe and pervasive as to have altered conditions of employment where plaintiff was called "a 'bitch' to her face nearly constantly for several years"); *Boumehdi*, 489 F.3d at 789 ("[a] jury reasonably could conclude from Boumehdi's testimony, which alleged that Vega made at least eighteen sexist or sexual comments in less than a year's time and that similar comments were made 'very often,' that Vega's conduct was pervasive enough to create a hostile work environment.");

*Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) (stating that a reasonable jury could find that work environment was objectively hostile where employee testified that he was repeatedly subject to hearing the "n-word").

The court acknowledges that Stribling provided conflicting testimony during his deposition regarding when the racially disparaging comments ended. (*See* ECF No. 34-8 at 26-27, 37-38.) But construing the evidence in the light most favorable to Stribling, issues of fact exist regarding whether the harassment Stribling experienced was objectively severe or pervasive enough to alter the terms of his employment.

### 3.2.3.  Basis for Employer Liability

An employer has an affirmative defense to a hostile work environment claim if the employer can show "(1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (citing *Faragher*, 524 U.S. at 807; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). This defense is not available when a supervisor's harassment results in a tangible employment action, such as discharge, demotion, or undesirable reassignment. *Faragher*, 524 U.S. at 808; *Ellerth*, 524 U.S. at 765.

Stribling does not allege that he suffered an adverse employment action for purposes of this defense. He remains employed as a feeder driver by UPS. As a result, UPS is not liable if it can demonstrate that it exercised reasonable care to prevent and to

Case 2:22-cv-00495-WED   Filed 05/03/24   Page 23 of 28   Document 39

correct any harassment and that Stribling unreasonably failed to take advantage of the preventative or corrective opportunities provided.

The first element of the *Faragher/Ellerth* affirmative defense is often satisfied by the existence of an appropriate anti-harassment policy. *Shaw v. Autozone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999). Additionally, "a prompt investigation is 'the hallmark of a reasonable corrective action.'" *Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 636 (7th Cir. 2009).

UPS argues that it exercised reasonable care to prevent and correct any harassing behavior that Stribling experienced. (ECF No. 23 at 13.) UPS's anti-harassment policy provides:

> Any employee who witnesses objectionable conduct or believes that he or she is subject to or may be subjected to objectionable conduct must report it immediately to a supervisor or manager, a Human Resources representative, the Human Resources manager, the Employee Relations manager, or the UPS Help Line (1-800-220-4126). These reports may be made verbally or in writing. Do not allow an inappropriate situation to continue by not reporting it, regardless of who is creating the situation. No employee in this organization is exempt from this policy.

> In response to such reports, UPS will conduct a prompt and thorough investigation. To the extent possible, investigations will be kept confidential among the employees concerned and those employees who need to be informed in order to complete the investigation. Any employee who brings such a report to the attention of the Company and in good faith and/or provides information related to such a report will not be adversely affected or retaliated against. UPS will take immediate and appropriate corrective action whenever it determines that harassment has occurred.

(ECF No. 25-9 at 2.)

In addition to its anti-harassment policy, UPS points out that each time Stribling submitted a written complaint or grievance it took action to address his concerns. (ECF No. 23 at 13.) After Stribling filed his first UPS Helpline complaint in March 2016, UPS instructed both men to stop interacting with each other and Dismukes was moved to a different shift. (ECF No. 23 at 13 (citing ECF Nos. 25-12 at 1-2; 34-8 at 15, 17, 23, 25).) After Stribling filed a second complaint through the Helpline in April 2016, UPS offered to hold meetings to settle the dispute, but Stribling refused to attend. (*Id.*) After Stribling complained when Watts fired him, UPS moved Watts to another department and rescinded the termination. (*Id.*) And when Stribling complained about the hat incident, UPS reiterated that Stribling and Dismukes should not interact with one another and allowed Stribling to use the nearby Kwik Trip for restroom breaks so he could avoid running into Dismukes. (*Id.*)

However, UPS has not responded to Stribling's assertions that it did not act on his verbal complaints to various UPS managers. As indicated above, UPS's anti-harassment policy allows employees to report alleged violations to supervisors, managers, HR staff, employee relations managers or the Helpline, either verbally or in writing. (*See* ECF No. 25-9 at 2.) Taking the evidence in the light most favorable to Stribling, a rational jury could conclude that, while UPS maintained anti-harassment and anti-discrimination policies, it did not take reasonable action to enforce those policies in response to Stribling's verbal complaints. The court cannot conclude as a

matter of law that UPS exercised reasonable care to prevent and correct the harassment that Stribling experienced.

As to the second element of the *Faragher/Ellerth* affirmative defense, while proof that an employee unreasonably failed to take advantage of the preventative or corrective opportunities provided by the employer "is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Ellerth*, 524 U.S. at 765; *see also Faragher*, 524 U.S. at 807-08.

UPS argues that Stribling unreasonably failed to take advantage of its reporting procedures. UPS points out that, while Stribling filed complaints through the UPS Helpline three times in 2016, he did not mention the racial harassment he allegedly experienced in any of those complaints. (ECF No. 23 at 13.) Additionally, UPS points out that, when UPS offered to conduct meetings to address his concerns, he refused to attend. (*Id.*)

In response, Stribling contends that he "availed himself on multiple occasions of the complaint process at UPS," pointing to his UPS Helpline complaints, his union grievances, and his verbal complaints to management and the HR department at UPS. (ECF No. 31 at 26.) Despite these efforts, Stribling maintains that UPS did not take action to resolve the ongoing harassment he experienced. (*Id.*)

But, as UPS points out, Stribling's Helpline complaints make no reference to the racial comments he allegedly experienced. (*See* ECF Nos. 25-12, 25-13, 25-14.) Neither do the union grievances he filed. (*See* ECF Nos. 25-4, 25-5, 25-6, 25-7.) Stribling cannot point to these complaints as evidence that he availed himself of UPS's corrective procedures because there is nothing in those documents that would put UPS on notice of the alleged racial harassment he experienced.

That leaves Stribling's allegations that he complained verbally to various personnel at UPS regarding Dismukes's ongoing racial comments to him. Stribling contends that he complained to manager Brian Zelinski on a weekly basis from 2016 to 2023 about Dismukes's conduct. (ECF Nos. 33, ¶ 26; 38, ¶ 32 (citing ECF No. 38-4 at 44).) He also maintains that he reported instances of harassment to manager Tracy Richter every week. (ECF No. 38, ¶ 33 (citing ECF No. 38-4 at 45).)

Again, the anti-harassment policy allows employees to report alleged violations to supervisors, managers, HR staff, employee relations managers or the Helpline, either verbally or in writing. (*See* ECF No. 25-9 at 2.) Construing the evidence in the light most favorable to Stribling, a rational jury could find that he reasonably took advantage of UPS's reporting procedures. As a result, the court cannot say as a matter of law that Stribling unreasonably failed to take advantage of the corrective procedures provided by UPS.

In sum, factual issues exist concerning the application of both elements of the *Faragher/Ellerth* defense, precluding entry of summary judgment in favor of UPS.

**4. Conclusion**

For the reasons stated above, UPS's motion for summary judgment will be granted in part and denied in part. UPS's motion is granted with respect to Stribling's claim that he was subject to a hostile work environment in retaliation for engaging in Title VII protected activity. It is denied with respect to Stribling's claim that he was subject to a racially hostile work environment. Stribling's race discrimination claim is dismissed.

**IT IS THEREFORE ORDERED** that UPS's motion for summary judgment (ECF No. 22) is **GRANTED IN PART and DENIED IN PART**.

Dated at Milwaukee, Wisconsin this 3rd day of May, 2024.

WILLIAM E. DUFFIN
U.S. Magistrate Judge